# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 1, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30041

_____

GREAT LAKES INSURANCE, S.E.,

*Plaintiff—Appellee*,

*versus*

GRAY GROUP INVESTMENTS, L.L.C.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-2795

_____

Before WIENER, HIGGINSON, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

> Hello, Dolly
> Well, hello, Dolly
> It's so nice to have you back where you belong . . . .[1]

Great Lakes Insurance, S.E. insured the Hello Dolly VI, a boat owned by Gray Group Investments, L.L.C.  The Hello Dolly sank in Pensacola,

_____

[1] From the Musical Production "HELLO DOLLY!" Music and lyrics by Jerry Herman, copyright 1963.

No. 22-30041

Florida, during a hurricane. Gray Group filed a claim under the insurance policy, Great Lakes denied coverage, and Great Lakes then sought a declaratory judgment that it properly did so. Ironically, the question largely turned on whether, contra her musical namesake, the Hello Dolly was "back where [she] belong[ed]," for purposes of coverage. The district court agreed with Great Lakes that she was not. We affirm.

## I.

## A.

Hurricane Sally struck the Gulf Coast in September 2020. In its path lay the Hello Dolly VI (hereafter, the Vessel), which was moored behind Gray Group's eponymous member Michael Gray's house in Pensacola. The Vessel sustained damage during the storm and sank at its mooring. The Vessel was insured under an insurance policy issued by Great Lakes. Great Lakes also insured several other watercraft within Gray Group's fleet under similar policies. Though the operative policy provided coverage for "named windstorms," Great Lakes denied coverage, asserting that Gray Group had breached several warranties.

Specifically, Great Lakes faulted Gray Group for breaching the "hurricane protection plan" (the HPP) that Gray Group had submitted in response to Great Lakes's "hurricane questionnaire" (the HQ). The HQ requested the Vessel's location during hurricane season and asked a series of questions regarding Gray Group's contingency plans in the event of a hurricane. In the HPP, Gray Group stated that the Vessel would be located at the Orleans Marina in New Orleans, Louisiana, and detailed the protective measures Gray Group would take when a hurricane approached.

The parties contest whether the HPP was incorporated by reference into the insurance policy, and, if so, whether Gray Group breached the HPP.

No. 22-30041

Before laying anchor there, we briefly chart the policy's incorporation clauses and the underlying documents at issue.

There are two incorporation clauses in the insurance policy. The first provides that "[t]his insuring agreement incorporates in full [Gray Group's] application for insurance[.]" The second states that "[t]his is a legally binding insurance document between [Gray Group] and [Great Lakes], incorporating in full the application form signed by [Gray Group]."

Gray Group submitted various documentation to facilitate underwriting for the policy at issue. Three such documents are particularly relevant: the "Application Form," the HQ, and the HPP. In the Application Form, Gray Group represented that the "primary mooring location of [the] Vessel . . . between July 1st [and] Nov[.] 1st" would be the Orleans Marina. In the HPP, Gray Group again named the Orleans Marina in response to the HQ's request for the "marina or residence where [the] [V]essel [would be] located between 1st July and 1st November[.]" Whether the policy's incorporating clauses encompass these underwriting documents determines the seaworthiness of Gray Group's appeal.

**B.**

After denying coverage, Great Lakes sought a declaratory judgment that Gray Group breached the HPP by failing to evacuate the Hello Dolly VI to safe harbor, keep the Vessel fully manned, deploy the anchor, and moor the Vessel at the Orleans Marina. Gray Group countersued, contending that the HPP was not incorporated into the policy, and in any event, that Gray Group did not breach the HPP.

Gray Group moved for judgment on the pleadings. The district court denied the motion, holding that the phrase "application for insurance" was ambiguous because it could refer solely to the Application Form, or to a broader set of documents inclusive of the HQ and the HPP. Therefore, the

district court found that evidence outside the pleadings was necessary to determine the meaning of "application for insurance."

The parties then filed cross-motions for summary judgment. Great Lakes contended, *inter alia*, that regardless of whether the HPP was incorporated, the Application Form certainly was, and Gray Group misrepresented facts in the Application Form. Gray Group filed a motion to strike that argument. The district court granted Gray Group's motion because "Great Lakes did not allege any misrepresentation by Gray Group in its complaint."

However, the district court agreed with Great Lakes on its other points and granted it summary judgment. Specifically, the district court held that the phrase "application for insurance" was ambiguous but that extrinsic evidence showed that the parties intended "application for insurance" to encompass the HPP. Continuing the analysis, the court concluded that Gray Group's statement in the HPP that the Vessel was to be located at the Orleans Marina during hurricane season was also ambiguous. Again resorting to extrinsic evidence, the court found that the HPP meant that the Vessel would be moored at the Orleans Marina for the majority of hurricane season. The court determined that the HPP's "marina or residence" location constituted a warranty by Gray Group and found that the Vessel had not in fact been moored at the Orleans Marina for the majority of hurricane season. Gray Group had thus breached its warranty, justifying Great Lakes's denial of coverage.

Gray Group timely appealed, challenging the district court's denial of its motion for judgment on the pleadings as well as the court's summary judgment for Great Lakes.

No. 22-30041

## II.

We review a district court's ruling on a motion for judgment on the pleadings *de novo*. *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017). We apply the same standard to a district court's grant of summary judgment. *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 178 (5th Cir. 2023). Under New York law,[2] we review a district court's interpretation of an insurance policy *de novo*. *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 93 (2d Cir. 2018) (applying New York law).

## A.

Gray Group's position is straightforward. It urges that "application for insurance" is unambiguous—the clause refers only to the Application Form—and Great Lakes did not plead a breach of the Application Form. Thus, no need for extrinsic evidence, and the district court's analysis and judgment run aground. Alternatively, Gray Group posits that if "application for insurance" is ambiguous, then the clause is insufficient to incorporate an external document as a matter of law due to that ambiguity.

Great Lakes takes a different tack, contending that Gray Group's responses to the HQ, through the HPP, were incorporated into the insurance policy through the "application for insurance." Per Great Lakes, "application for insurance" is ambiguous, but uncontroverted extrinsic evidence establishes that the parties intended the term to include the HPP.

So we must first consider (1) whether the term "application for insurance" is ambiguous, and, if so, (2) whether that ambiguity precludes incorporating by reference Gray Group's responses to the HQ via its HPP.

---

[2] The parties agree that New York law applies in this case.

5

**1.**

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (citation and quotation marks omitted). Whether an insurance contract is ambiguous is a question of law. *Id.* A contract is ambiguous when its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (citation and quotation marks omitted).

The Great Lakes insurance policy at issue "incorporat[es] in full the application form signed by [Gray Group]." The policy also "incorporates in full [Gray Group's] application for insurance[.]" Gray Group contends that both phrases refer to the same thing: the Application Form. Great Lakes counters that the phrase "application for insurance" plausibly includes more than just the Application Form—like, say, the documents Gray Group submitted during underwriting (including the HPP)—such that the policy's language is ambiguous.

We agree that the phrase "application for insurance" is ambiguous. The Application Form is clearly labeled as such, so the corresponding policy reference seems clear. But the "full" "application for insurance," slightly different nomenclature, implies a broader set of documents, including the Application Form *and* those Gray Group submitted during underwriting. The difference in verbiage is critical because under principles of contract interpretation, "[a] word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." *Landry's, Inc. v. Ins. Co. of the State of Pennsylvania*, 4 F.4th 366,

370 (5th Cir. 2021) (quoting Antonin Scalia & Bryan Garner, Reading Law 170 (2012)); *see also Two Farms Inc. v. Greenwich Ins. Co.*, 628 Fed. App'x 802, 805 (2d Cir. 2015) (applying New York rule that "a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons") (citation and quotation marks omitted)). Because "application for insurance" "could suggest more than one meaning" to a "reasonably intelligent person," *Parks Real Estate*, 472 F.3d at 42, the term is ambiguous. So, we sail on to determine the effect of that ambiguity.

**2.**

The parties' disagreement as to the effect of the ambiguity is premised on competing understandings of New York's incorporation by reference doctrine. Gray Group posits that an incorporating clause must clearly identify an incorporated document; therefore, if the clause is unclear, it cannot effectuate a valid incorporation by reference. Essentially, Gray Group contends that if there is any ambiguity in what is incorporated, then the document in question is not. Great Lakes counters that the meaning of an ambiguous incorporating clause can be determined by extrinsic evidence, as with any other contractual provision. Therefore, a finding of ambiguity does not foreclose incorporation by reference—it merely shifts the issue to the factfinder. We agree with Great Lakes.

The Court of Appeals of New York has long recognized the concept of incorporation by reference. *See In re Bd. of Comm'rs of Washington Park*, 52 N.Y. 131, 134 (1873); *see also Tonnele v. Hall*, 4 N.Y. 140 (1850). Under New York law, a document is incorporated into a contract if "(1) it is clearly identified in the agreement, and (2) the contract contains language that clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract, rather than merely to acknowledge that

the referenced material is relevant to the contract." *Matter of Linn Energy, L.L.C.*, 927 F.3d 350, 353 (5th Cir. 2019) (citation and quotation marks omitted) ("New York courts use an objective standard, asking whether a reasonable person would understand the specific document to be incorporated by reference."). "[T]he paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (emphasis omitted) (quoting C*hiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 628 (N.Y. App. Div. 1986)). "[I]t must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id.* (citation and quotation marks omitted). The doctrine "is grounded on the premise that the material to be incorporated is so well known to the contracting parties that a mere reference to it is sufficient." *Chiacchia*, 124 A.D. 2d at 628; *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 295 n.6 (2d Cir. 2015).

For nearly as long as New York has recognized incorporation by reference, its Court of Appeals has allowed "[p]arol evidence . . . to prove the identity of the paper [that the parties attempted to incorporate]." *Bd. of Comm'rs of Washington Park*, 52 N.Y. at 134. New York courts have held that, generally, an ambiguity as to the identity of the incorporated document creates a fact issue. *See, e.g.*, *Maines Paper & Food Serv., Inc. v. Keystone Assoc.*, 134 A.D. 3d 1340, 1342 (N.Y. App. Div. 2015) (weighing the evidence to determine whether the purportedly incorporated document was sufficiently identified in the executed contract); *Kenner v. Avis Rent A Car Sys., Inc.*, 254 A.D.2d 704, 704 (N.Y. App. Div. 1998) (holding that "[t]here is a triable issue of fact whether the oblique reference in the rental agreement to an otherwise unidentified 'rental document jacket' meets th[e] exacting standard [of incorporation by reference]"); *Chiacchia*, 124 A.D. 2d at 628

No. 22-30041

("Whether the paper encompassing the bank rules was referred to or described in the rental agreement such that it could be identified beyond all reasonable doubt constitutes a question of fact precluding summary judgment."). But "[i]f the extrinsic evidence is 'so one-sided that no reasonable person could decide the contrary,' the court may resolve the ambiguity as a matter of law." *Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 589 (5th Cir. 2011) (citation omitted) (applying New York law).

Gray Group relies on *Linn Energy* for the proposition that if a purportedly incorporated document is not "clearly identified in the agreement," 927 F.3d at 353, i.e., if the incorporating clause is unclear, then there is no valid incorporation. True, "the paper to be incorporated . . . by reference must be . . . identified beyond all reasonable doubt." *PaineWebber*, 81 F.3d at 1201 (quoting *Chiacchi*, 124 A.D. at 628). But that does not alter the general rule that a court may examine extrinsic evidence to ascertain the meaning of an ambiguous contract. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("If an ambiguity is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." (cleaned up)) (applying New York law). Consistent with the New York cases discussed earlier, the general rule about consulting extrinsic evidence is as shipshape when ascertaining the meaning of an ambiguous incorporating clause as it is in any other context.

## B.

Having surveyed the waterfront, we may cruise through the remaining issues on appeal. Gray Group urges that the district court erred by (1) denying its motion for judgment on the pleadings; (2) finding that the HPP was incorporated into the policy; and (3) concluding that the Vessel's

9

No. 22-30041

"marina or residence" location provided by Gray Group in the HPP was a warranty that required the Vessel to moor at the Orleans Marina for the majority of hurricane season.

**1.**

We affirm the district court's denial of Gray Group's motion for judgment on the pleadings.[3]  "We evaluate a motion under Rule 12(c) for judgment on the pleadings using the same standard as a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir 2010).  We thus must determine "whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Id.* (citation and quotation marks omitted).  As discussed above, the policy language at issue is ambiguous.  While that is not dispositive as to whether the underwriting documents in question were validly incorporated by reference, it does mean that the scope of the policy's incorporating language turns on extrinsic evidence beyond the scope of the pleadings.  Accordingly, the district court did not err in denying Gray Group's Rule 12(c) motion.

**2.**

Next, we consider whether Gray Group's HPP, with its representation that the Vessel's "marina or residence" location during

---

[3] Great Lakes argues that Gray Group failed to preserve its incorporation by reference argument in the district court.  It is axiomatic that "[w]e will generally not countenance arguments not raised before the district court," *McManaway v. KBR, Inc.*, 852 F.3d 444, 455 (5th Cir. 2017), but Gray Group adequately raised the argument.  Gray Group urged in its motion for judgment on the pleadings that "[t]he policy does not incorporate, attach, reference or ever mention the [HQ or the HPP]," and the district court noted that the incorporation argument was before it:  "[Gray Group] moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that the pleadings establish that the [HQ/HPP] was not a warranty because the agreement does not incorporate it . . . ."

hurricane season was the Orleans Marina, was included in the policy's ambiguous incorporation of Gray Group's "application for insurance." To remind, the full clause reads: "This insuring agreement incorporates in full [Gray Group's] application for insurance[.]" Under New York law, the burden rests on the insurer to prove that its interpretation of an ambiguous policy provision is correct. *Jefferson Block 24 Oil & Gas*, 652 F.3d at 589. "[T]he court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract [and] may resolve the ambiguity as a matter of law" "[if] the extrinsic evidence is so one-sided that no reasonable person could decide the contrary[.]" *Id.* (quotation marks and citation omitted).

The district court did not err in concluding that the HPP was incorporated into the policy. For starters, under a bolded header labeled "WARNING," the HQ, which prompted Gray Group's submission of the HPP, advised that "this declaration and warranty shall be incorporated in its entirety into any relevant policy of insurance." Gray Group's Fleet Risk Manager, Louis S. Crew, Jr., signed the HQ directly beneath that warning.

The parties' prior course of dealing removes any lingering doubt that Gray Group's "application for insurance" encompassed the HPP. In 2017, Great Lakes's underwriter notified Gray Group that another policy[4] then in force would expire in 15 days if Gray Group did not provide additional requested documentation, including a hurricane protection plan as to the insured watercraft. The underwriter followed up eight days later to remind Gray Group that the document remained outstanding and that failure to send it would void coverage. This exchange repeated itself in 2019, when Great

---

[4] This policy covered a different boat owned by Gray Group, but it is undisputed that Gray Group's other vessels were insured under policies materially identical to the one at issue here.

Lakes reminded Gray Group's broker that the requested hurricane protection plan "forms part of the policy." Additionally, Gray Group's Crew testified in his deposition that he "underst[oo]d that it [(the HPP)] would be incorporated into the policy."

Against this backdrop, the district court did not err in holding that the extrinsic evidence was "so one-sided that no reasonable person could decide" that the HPP was not incorporated into the policy. As it was properly incorporated, our next port-of-call is the interpretation of the HPP, and specifically the HPP's representation regarding the Vessel's "marina or residence" during hurricane season.

**3.**

In the HPP, Gray Group stated that the Orleans Marina was "the marina or residence where [the] [V]essel [would be] located between 1st July and 1st November." The district court concluded that this statement is ambiguous.[5] The court then relied on several email exchanges between the parties to ascertain its meaning. In 2019, Great Lakes's broker asked Gray Group's agent whether one of Gray Group's boats would be in the Bahamas or Florida during hurricane season and explained that the information was important because if so, the premium would increase to account for the greater risk. Later in 2020, Gray Group's agent contacted Great Lakes's agent to ask if the same boat could travel to Florida and the Bahamas once hurricane season began. Great Lakes's agent responded:

> [The] application form showed that the[] mooring location during July to November would be Mississippi[,] and [the underwriters] rated the risks as such. If [a boat] change[d its]

---

[5] We discern no error in the district court's determination that the HPP's representation as to where the Vessel would be located is ambiguous. And Gray Group does not contend otherwise.

> mooring location to [the] Bahamas for the majority of hurricane season[,] then this must be re-rated. We rate on the assumption of where the vessel will be for the majority of the season.

The agent also stated that "[i]f [the boat] will spend the majority of that season in Mississippi[,] then the premium can stay the same[.]" In 2020, Great Lakes's underwriter again noted that "to amend the mooring location during the hurricane season" may require a premium increase.

Considering this evidence, the district court concluded that the HPP's representation regarding the Vessel's "marina or residence" location meant "the place where the [V]essel [was] to be moored the majority of hurricane season." We agree with the district court that the evidence establishes that the parties' contractual intent was that the Vessel be moored at the Orleans Marina for, if not the majority, at least some portion of hurricane season. We acknowledge that the email exchanges regarding the "mooring location" pertain to the Application Form, which requested the "primary mooring location" of the Vessel, and not the HQ or the HPP, which adduced "the marina or residence" where the Vessel would be "located" during hurricane season. Nevertheless, we conclude that the evidence also crystallizes the meaning of the HPP's representation about where the Vessel would be "located."

First, both the Application Form's request and the HPP substantively center on the Vessel's location during hurricane season. Whatever the distinctions between the "primary mooring location" and the "marina or residence" where the Vessel would be "located" during the season, Gray Group listed the Orleans Marina in response to both. At bottom, the extrinsic communications between the parties illuminate the parties' intent as to both the Application Form and the HPP: Great Lakes requested that Gray Group provide the marina where the Vessel would be located for the same reason it

13

requested its primary mooring location, *viz.*, because the insurer rated its policy premium "on the assumption of where the [V]essel [would] be for the majority of the season." *Cf. Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., N.A.*, 773 F.3d 110, 116 (2d Cir. 2014) (rejecting proposed interpretation where "it cause[d] the word to carry different meanings in different iterations within the same contractual provision, indeed within the same sentence").

Inversely, Gray Group proffers no evidence to suggest a different interpretation of the HPP's representation. This dearth of proof to the contrary only buttresses the district court's interpretation of the HPP's language. *See Jefferson Block 24 Oil & Gas*, 652 F.3d at 589; *see also* Fed. R. Civ. P. 56(c)(1)(A).

Finally, and logically, the HPP's representation about the "marina or residence" where the Vessel would be "located" must mean *something*. Whether the provision means that the Vessel was to be located at the Orleans Marina "the majority of hurricane season," or for some lesser period, or for only intermittent docking, it is undisputed that the Vessel was *never* at the Orleans Marina during the 2020 hurricane season. Thus, regardless of the precise requirement that the HPP imposed, Gray Group did not meet it. All that remains is to determine the effect of that lapse.

**4.**

The district court concluded that the HPP's representation regarding the Vessel's "marina or residence" location was a warranty such that Gray Group's breach of it voided the policy both under New York law and the terms of the policy. We consider only the latter justification and easily conclude that the district court did not err in its analysis.

The policy provides that:

No. 22-30041

> Where any term herein is referred to as a 'warranty' or where any reference is made herein to the term 'warranted,' the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

The HPP expressly identifies its contents, including the information in question, as warranties, providing that the insured "declare[s] that the particulars and answers in this form are correct and complete in every respect," and that "this declaration and warranty shall be incorporated in its entirety into any relevant policy of insurance." Therefore, under the terms of the policy, as validly augmented by the HPP, Gray Group warranted that the Vessel would be "located" at the Orleans Marina during hurricane season. Gray Group's breach of that warranty voided the policy *ab initio*, such that Great Lakes properly denied coverage.

## III.

The Hello Dolly VI never got "back where [she] belong[ed]." Gray Group's representations to the contrary were validly incorporated into the policy as warranties, and Gray Group's breach of its warranties justified Great Lakes's denial of coverage when the Hello Dolly sank. Accordingly, the district court properly granted summary judgment for Great Lakes.

AFFIRMED.